HAMILTON *v.* MEIKS ET AL.
[No. 26,787.  Filed November 17, 1936.]

*Noel, Hickam, Boyd & Armstrong, Gavin & Gavin, James L. Shannon* and *Herbert C. Jones,* for appellant.

*Rollin A. Turner, Robert C. Porter, Edward K. Adams* and *Wilbur F. Pell,* for appellees.

FANSLER, J.—Appellant began this action seeking a judgment declaring her personal liability, or lack of it, on a guaranty appearing on the back of $170,000 of preferred stock issued in the year 1922 by the J. B. Hamilton Furniture Company, a corporation, to appellees Porters and Hester Porter Fuller. The stock was issued pursuant to a written agreement between the Porters on the one part and Joseph B. Hamilton, Lucy Hamilton, and appellant on the other part, by which the first parties transferred and assigned to the second parties all of the capital stock of the C. H. Campbell Furniture Company and all of the assets and property of that company, in consideration of which the second parties agreed to procure a reorganization of the company under the name of J. B. Hamilton Furniture Company and to increase the capital stock of the company, and provide for $170,000 of preferred stock to be issued to the second parties and by them assigned and transferred to the first parties. The said preferred stock was to be due and payable at the end of ten years from February 15, 1922, and was to provide for the payment of cumulative dividends at the rate of 7 per cent per annum, payable semi-annually. It was provided in the contract that "said certificates of preferred stock to be endorsed by the said Joseph B. Hamilton and Emma Hamilton, personally." The contract was carried out, the company reorganized, the stock increased, and the preferred stock referred to was issued to the Hamiltons and by them assigned to the Porters as agreed, and the certificates were indorsed on the back as follows:

"We, the undersigned, guarantee the payment of this certificate of stock, according to its terms.
Dated the 29th day of March, 1922.

JOSEPH B. HAMILTON,
EMMA HAMILTON."

The court concluded as a matter of law that, under this

agreement, appellant was liable to pay any amounts which were not paid by the J. B. Hamilton Furniture Company, according to the terms of the contract, and that the Porters and Hester Porter Fuller are creditors of Emma Hamilton to the extent of any unpaid amounts which were due upon the preferred stock.

It is contended by appellant with much earnestness that the liability of the corporation under the preferred stock certificates was only the liability of a corporation to its stockholders; that the guaranty was no broader and imported no greater liability on the part of the appellant than the liability of the corporation expressed in the certificate. In other words, that the guarantors merely agreed that if and when funds were available and due from the corporation to the holders of the preferred stock, either for the purpose of paying interest or for redemption, they would be paid by the corporation; that, since the corporation is insolvent and in the hands of a receiver and there are no funds available, there is nothing due from the corporation, and therefore nothing due from appellant under the guaranty. This position cannot be sustained. In the contract it is said that the preferred stock is to be "endorsed" by the Hamiltons, but when the stock was issued the intention and meaning of the parties was interpreted by appellant in the indorsement quoted above, which was actually put upon the stock. This amounts to an unqualified guaranty of the payment of the certificate of stock according to its terms. It could mean nothing else than an agreement that if the corporation did not pay, or if it could not pay, the guarantors would pay. Much evidence was heard, but it would seem that the contract and agreement of the parties clearly and unequivocally discloses the obligation of appellant, and there is no necessity to look further than their written agreement. It is contended that the corporation could not lawfully bind itself to

pay, that is, to redeem its preferred stock within ten years; that such an agreement being invalid was not enforceable against the corporation, and that it is not therefore enforceable against appellant. It is not necessary to decide whether or not the corporation had the right to make such an agreement, and whether it is enforceable. The corporation did have the right to redeem its stock at the end of ten years if it had the funds with which to do so, and appellant had the undoubted right to guarantee that it would have the funds and would redeem the stock, and to agree to redeem it and pay if the corporation did not do so, and this without regard to whether the corporation could be compelled to redeem and pay if it failed to voluntarily do so. Even indorsers on ordinary promissory notes are compelled to pay where the principal fails, notwithstanding payment cannot be enforced as against the principal because of exemption laws or insolvency, and notwithstanding the principal has agreed to waive exemption laws, which he may not effectively do because of a public policy which forbids. If the contract of an infant for the payment of money is indorsed, and the infant does not pay according to its terms, the indorser will be liable notwithstanding the contract could not be enforced against the infant. And the same rule applies to indorsers or guarantors of the contracts of married women when they were without power to bind themselves by contract. In *Davis et al.* v. *Statts* (1873), 43 Ind. 103, a case in which sureties for a married woman advanced the same contention that appellant advances here, that is, that "a surety is not liable further than the principal, and whatever discharges the principal discharges the surety," it was held that the contention could not prevail, and many authorities are cited to sustain the view. The obligation of a surety differs but little from that of a guarantor, and the differences are

technical and generally not substantial. It is said in the text of 28 C. J. 909, that, as a general rule, the liability of the principal debtor measures the limits of the liability of the guarantor, and that where the contract is invalid as to the principal maker the guaranty agreement cannot be enforced, but that there are exceptions to this rule "where the defect is not in the contract itself but pertains to matters which are personal to the principal debtor, or which arise from causes which originate in the law." In subsequent sections and notes cases are cited involving contracts of married women, infants, and corporations, which were enforced against guarantors when they could not have been enforced against the principals. But the contract here involved is not invalid. In any view of the statutory powers of corporations, with respect to preferred stock, it was lawful for the corporation to pay the dividends upon the preferred stock and redeem the preferred stock within the time specified in the stock certificate if earnings were available for that purpose. The contract therefore was not unlawful or invalid. It was at most only unenforceable against the corporation in the event there were no earnings out of which to pay. The agreement of the guarantor was not to do what the corporation could be compelled to do; the agreement was to do what the corporation agreed to do. The corporation having failed or become unable to do what it had agreed, appellant became liable upon her obligation for "the payment of this certificate of stock according to its terms."

In 1930 appellant assigned her property in trust to appellees George H. Meiks and The Shelby National Bank under a contract which recites that appellant is indebted to divers creditors named in the schedule attached, and that her debts are becoming due and payable; that she does not have liquid assets at her disposal with which to pay the indebtedness; that in order to

pay her obligations it will be necessary to dispose of certain of her property and assets and convert it into cash; that she is desirous of placing her property "in such manner so that the largest amount of funds possible may be realized therefrom; and that the same, when so realized, be applied to the payment of said obligations and said creditors are consenting to have said property so used . . . and to avoid, so far as it can be done, the costs and expense of litigations, and to prevent the sacrificing of property." It is represented in the contract that appellant's gross assets, subject to the payment of her indebtedness, are largely in excess of her indebtedness, but that the assets are not readily convertible into cash by sale without sacrifice and expense; that it is believed to be to the mutual interest of herself and creditors that her assets be conserved and liquidated for the benefit of all parties concerned. The contract and conveyances thereunder vest title to "all of her property, real and personal," in the trustees "in trust for the benefit of said creditors, and to have the same managed, controlled and liquidated so far as necessary by said Trustees, for the benefit of said creditors, except, however, such part of said property as shall by this agreement be reserved and set aside for the use of the said Trustor." The clause reserving property from the assignment is as follows: "The property set out and described in 'Schedule B,' attached hereto, shall be set aside and set over to the said Emma Hamilton for her use as a residence, free from all obligations thereon, including taxes, the same to be used by her for the purpose aforesaid, so long as this trust agreement shall continue, and in addition thereto the said Emma Hamilton reserves, and it is agreed that she shall receive out of the rent, income and proceeds of said trust property, the sum of Six Thousand Dollars ($6,000.00) per year, payable to her by the said Trustees out of such

proceeds, in twelve (12) equal monthly payments, beginning on the 1st day of November, 1930, the same to be for her exclusive and personal use."

It was contended by appellees, and held by the court below, "that the only fund out of which she was and is entitled to receive her yearly allowance of $6,000 is that coming into their hands as trustees from the gross rents, income and profits upon the corpus of the property in their hands as such trustees, and does not include the proceeds from any sale or liquidation of such corpus, but that all of such proceeds shall be for the benefit of the creditors." This conclusion seems to have been arrived at upon the theory that, since the word "proceeds" follows, and is used in connection with, "rents and income," the rule of *ejusdem generis* applies, and that the word "proceeds" refers to only such proceeds as are derived from rents and income. But rules of construction may only be resorted to to determine the meaning and intention of parties in the use of words in their contracts when the meaning is so ambiguous or obscure that their intention cannot be determined from the language of the contract itself. It does not seem necessary to depart from the contract itself for a determination of the meaning of the word "proceeds" as used therein. It is argued that the contract gives the trustees the right to sell and convey the properties and collect "the proceeds derived therefrom and pay out and dispose of the same for the benefit of the said creditors until the obligations of said creditors shall be paid in full," and that this indicates an intention that the money received for a sale of any of the corpus of the property is to be used exclusively for the payment of creditors, but it will be noted that the word "proceeds" is here used in reference to sums received from the sale of property. It is also argued that the language of the instrument, which provides that "it is the intention and

purpose of this trust agreement that said property shall be converted into cash or liquid assets and applied to the payment of the creditors as rapidly as the same can be done," sustains the contention that all funds received from the liquidation of assets were to be paid to the creditors. But it is also noted that out of the corpus of her estate her residence is unqualifiedly reserved in appellant, and that there is reserved for her, even at the expense of delay in the payment of her creditors, in full or in part, an income of $6,000 per year "out of the rent, income and proceeds" of said trust property. It is not only the proceeds of the sale and liquidation of the property that are to be used under the contract for the payment of creditors, but the rent, profits, and income also. It is provided that all of the property assigned and conveyed to the trustees shall be held, owned, and controlled with the "rents, profits and income arising therefrom . . . for the purposes granted and stated herein." The purpose, of course, is the payment of appellant's creditors. It is provided that the "proceeds" derived from the sale of property after the payment of liens, etc., are "to be applied and used in the general funds of said estate." The only other sources from which general funds would arise are rents, income, and profits. It is also provided that "said Trustees shall apply the proceeds derived from the management of said estate by them to the payment of the debts at any time there is sufficient funds on hand to pay not less than ten per cent on the debts entitled to share in such distribution." It would not be contended that the word "proceeds" here does not include the proceeds of the sale of the corpus of the estate as well as rents, income, and profits; and still, it cannot reasonably be contended that, if prior to the first day of any month, there were in the hands of the trustees funds sufficient to pay 10 per cent of appellant's debts, and no more, it was the intention that all

of such funds should be paid out, leaving nothing with which to pay appellant her monthly installment of the $6,000 reservation of income for her; and that if again before the first of the following month there were sufficient funds to pay 10 per cent of the debts, and no more, they should again be paid out, and so on each month; and that under such circumstances it was not intended by the contract that appellant should receive any income. Such a contention is obviously unreasonable. Appellant had conveyed all of her property in trust for her creditors. It was assumed by her to be more than enough to pay her debts. The purpose of the assignment was to avoid hasty liquidation and the loss incident thereto. All of her creditors agreed to the terms of the trust, and it will be noted in passing that she listed the Porters as creditors. It is apparent from the record that appellant was an elderly woman and that she was the owner of a considerable estate. It is clear that she desired to retain her home in which to live and sufficient means to pay her living expenses. This income is fixed in a definite and limited amount. She reserved no other source of income. It cannot be reasonably concluded that appellant had expected, or that her creditors expected her, to live entirely without income in the event there were no incoming rentals or profit from her property, or that, rentals and income having been paid to creditors until it was exhausted prior to the first of any month, she should not have recourse to funds from the sale of property in order that she might live. There is nothing in the context of the long agreement to indicate that the word "proceeds," which is used in the fourth paragraph of the contract in its broad sense so as to include not only rents, profits, and income, but also funds derived from the liquidation of assets, and in the ninth clause of the contract in the same sense, was intended to be limited in its meaning in the second

clause to that part of the proceeds of the trust property which arose out of rent, income, and profits only. That there was no design and intention to separate rent, income, and profits from the proceeds of the sale of property in liquidating it, is indicated by the provision of the seventh paragraph of the contract, which provides that the net proceeds from sales, after paying liens and encumbrances, shall be "applied and used in the general funds of said estate." If the contract could be interpreted as intending that the reserved income of appellant should be paid exclusively from rents, income, and profits, there might be a basis for a contention on her part that such "proceeds" should be reserved for that purpose, and not applied to the liquidation of her debts, which was clearly not intended. No basis is found for the trial court's conclusion that the word "proceeds" should be given a more limited meaning in the clause reserving an income to appellant than in the other sections of the contract, and the court therefore erred in its conclusion four.

For this error, the judgment is reversed, with instructions to the trial court to restate its fourth conclusion of law consistent with this opinion, and to render judgment accordingly.

Tremain, J., not participating.